UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| NORTH AMERICAN TRUCK & TRAILER, INC., a South Dakota corporation;<br><br>Plaintiff,<br><br>vs.<br><br>DENNIS EAGLE, INC., a Delaware corporation;<br><br>Defendant. | 4:25-CV-04187-KES<br><br>ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS |

North American Truck & Trailer, Inc. (NATT) filed a lawsuit against Dennis Eagle, Inc. (DEI), alleging claims of (1) Breach of Contract and the Implied Covenant of Good Faith and Fair Dealing, (2) Violation of the South Dakota Dealer Act, SDCL § 32-6B-1, et seq., (3) Violation of SDCL § 37-5, et seq., and (4) Fraudulent Inducement. Docket 1. DEI now moves to dismiss NATT's complaint under Federal Rule of Civil Procedure 12(b)(6). Docket 47. The court issues the following order.

**BACKGROUND**

When reviewing a motion to dismiss under Rule 12(b)(6), this court accepts the facts alleged in the complaint as true and construes all reasonable inferences in the light most favorable to the plaintiff. *See Epps v. Stewart Info. Servs. Corp.*, 327 F.3d 642, 646-47 (8th Cir. 2003); *Schaaf v. Residential*

*Funding Corp.*, 517 F.3d 544, 549 (8th Cir. 2008). The facts as alleged in the complaint are:

NATT is a South Dakota corporation with its principal place of business in Sioux Falls, South Dakota. Docket 1 ¶ 4. DEI is a manufacturer of commercial truck chassis primarily used in the refuse business. *Id.* ¶ 10. DEI is a Delaware corporation with its principal place of business in South Carolina. *Id.* ¶¶ 5, 10.

In February 2023, NATT and DEI entered into the Dennis Eagle Dealer Sales and Service Agreement (the Dealer Agreement), a seven-year commitment. *Id.* ¶ 2; Docket 1-1 ¶ 5. Under the Dealer Agreement, DEI granted NATT exclusive rights to market and sell DEI's "vocational truck Pro View chassis range" and "parts and accessories" in South Dakota, North Dakota, and Nebraska. Docket 1-1 at 1, 12-13. The Dealer Agreement included a choice-of-law provision wherein the "[a]greement shall be interpreted, construed, and enforced according to the laws of the State of Delaware" unless any "provisions, terms, conditions, or requirements of" the agreement "conflict with, undermine, or violate public policy of the State of South Dakota[.]" *Id.* at 10.

On or around July 14, 2023, NATT purchased three DEI Pro View chassis for approximately $210,000 each. Docket 1 ¶ 13. In March 2025, NATT upfitted one of these chassis with a rear load refuse packer, increasing the chassis' value to approximately $350,000. *Id.* During this same time, NATT

"invested heavily in equipment, training, and marketing related to the DEI product line." *Id.*

Prior to entering the Dealer Agreement, Joe McCalip, the Dealer Development Manager at DEI, repeatedly represented DEI's "strong financial position" to NATT. *Id.* ¶ 12. McCalip claimed that "DEI was so financially secure that NATT could travel to the U.K. to visit the parent company and its facilities, and DEI would ostensibly 'spare no expense' for hospitality and entertainment for NATT." *Id.* NATT states that McCalip's representations "about DEI's financial strength were a key factor in NATT's decision to enter into the Dealer Agreement." *Id.*

On April 14, 2025, GGG Partners, LLC, on behalf of DEI, sent NATT a letter (the Cessation Letter), stating that "[t]he present market conditions for the vehicles manufactured and sold by [NATT] make its continued participation in the market untenable and the ultimate return for stakeholders nonexistent." Docket 1-2 at 1. This letter expressed DEI's intention to "wind up [...] its operations and [cease] business." *Id.*; Docket 1 ¶ 14. DEI offered a cash rebate of $30,000 per chassis as compensation. Docket 1 ¶ 14; Docket 1-2 at 1. On April 25, 2025, GGG Partners, LLC, sent a revised letter, adding a provision concerning DEI's obligation under the Dealer Agreement to supply certain parts for ten years after discontinuance. Docket 1 ¶ 15; Docket 1-3 at 1-2; Docket 1-1 at 2.

NATT rejected DEI's offer on June 3, 2025. Docket 1 ¶ 16; Docket 1-4. In NATTs rejection letter, it explained that DEI effectively engaged in a "*de facto*

termination [of the Dealer Agreement] by announcing Dennis Eagle's dissolution and cessation of U.S. operations[.]" Docket 1-4 at 2 (emphasis in original). NATT demanded that DEI comply with its obligations under the Dealer Agreement and South Dakota law. Docket 1 ¶ 16; Docket 1-4 at 2-4. NATT also alleged that due to DEI's de facto termination of the Dealer Agreement, DEI has "significantly disrupted NATT's dealership business for the DEI chassis." Docket 1 ¶ 17. As NATT claimed in its complaint, "[d]ue to the uncertainty surrounding warranty, parts, and service support, customers in NATT's limited market are no longer willing to purchase or even seriously consider purchasing DEI trucks." *Id.* After receipt of the Cessation Letter, "the market for DEI's products collapsed immediately[.]" *Id.*

On September 22, 2025, NATT filed suit against DEI, alleging claims of breach of contract and the implied covenant of good faith and fair dealing, a violation of the South Dakota Dealer Act, a violation of the South Dakota Buy-Back Law, and fraudulent inducement. Docket 1. NATT seeks actual monetary damages in an amount exceeding $1,000,000.00. *Id.* ¶ 51. NATT further seeks a declaratory judgment that DEI must repurchase the three chassis at a purchase price of the "most current dealer net," or in the alternative, at a purchase price of 100% of their net cost. *Id.* at 19. Finally, NATT seeks punitive damages for violations of South Dakota's statutes and NATT's complete costs, disbursements, and reasonable attorneys' fees incurred in this case. *Id.*

**LEGAL STANDARD**

Federal Rule of Civil Procedure 12(b)(6) provides that the court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To avoid dismissal under Rule 12(b)(6), a plaintiff must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Exhibits to a pleading are "part of the pleading for all purposes." Fed. R. Civ. P. 10(c). A complaint is facially plausible where its factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqba*l, 556 U.S. 662, 678 (2009). The court's assessment of whether the complaint states a plausible claim for relief is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

A stricter pleading standard applies to fraud claims, which requires parties to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). To satisfy the standard, "the complaint must plead such facts as the time, place, and content of the defendant's false representations[.]" *U.S. ex rel. Joshi v. St. Luke's Hosp., Inc.*, 441 F.3d 552, 556 (8th Cir. 2006). In other words, the plaintiff must identify "the who, what, where, when, and how" of the alleged fraud. *Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 550 (8th Cir. 1997).

**DISCUSSION**

## I. Count I: Breach of Contract and Implied Covenant

### A. Choice of Law

DEI and NATT signed a Sales and Service Agreement that included a Delaware choice-of-law provision. Docket 1-1 at 10. But the South Dakota Dealer Protection Act (SDDPA) states:

> [a]ny provision in any agreement evidenced by a franchise agreement, sales agreement, security agreement, or other form of agreement or arrangement of like effect between any wholesaler, manufacturer, distributor of farm machinery or implements, or distributor of industrial or construction equipment and a retail dealer restricting jurisdiction or venue to a forum outside this state or requiring the application of the laws of another state to disputes arising under the agreement is void as a matter of public policy.

SDCL § 37-5-11. Because the SDDPA mandatorily applies, despite the Delaware choice-of-law provision, South Dakota substantive law governs this dispute. *See Diesel Mach., Inc. v. Manitowoc Crane Grp.*, 777 F. Supp. 2d 1198, 1204 (D.S.D. 2011) (applying South Dakota law to construe a distributor sales and service agreement that contained a choice-of-law clause pointing to Wisconsin law).

### B. Breach of Contract

NATT alleges that DEI breached both the Dealer Agreement and the implied covenant of good faith and fair dealing by sending the Cessation Letter on April 14, 2025. Docket 1 ¶ 22.

The elements of breach of contract are: "1. [a]n enforceable promise; 2. [a] breach of the promise; 3. [r]esulting damages." *Guthmiller v. Deloitte &*

*Touche, LLP*, 699 N.W.2d 493, 498 (S.D. 2005).[1] South Dakota courts "seek[] to effectuate the parties' intent according to the plain meaning of the agreement's terms." *Boyd v. Deadwood Tobacco Co.*, 178 F.4th 1132, 1148-49 (8th Cir. 2026).

NATT attached the "Sales and Service Agreement" to its complaint. *See* Docket 1-1. Although the attached contract is only signed by NATT, *id.* at 11, DEI performed under the contract by selling three DEI Pro View chassis in 2023 to NATT as a DEI dealer. Docket 1 ¶ 13; *see Hahne v. Burr*, 705 N.W.2d 867, 872 (stating that whether acts are "sufficient to constitute partial performance" is case-dependent and "is a matter of law to be decided by the court."). Further, DEI's portrayal of its relationship with NATT in the Cessation Letter supports DEI's assent to the Dealer Agreement by referring to NATT as a DEI dealer. *See* Docket 1-2 at 1. NATT has sufficiently pleaded an enforceable promise under the Dealer Agreement.

In its complaint, NATT alleges DEI breached §§ 6, 7(e), 10, 18, 21, and 27 of the Dealer Agreement by sending the Cessation Letter, which it claims operated as a de facto termination and breach. Docket 1 ¶ 22. Section 6 refers to DEI's obligation to supply parts for ten years after discontinuing any or all products. Docket 1-1 at 2. This alleged breach is meritless in light of DEI's

---

[1] Even if the court were to apply Delaware law according to the choice-of-law provision, the analysis would be the same under three similar elements. *See H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 140 (Del. Ch. 2003) (defining a breach of contract claim's three parts: "1) a contractual obligation; 2) a breach of that obligation by the defendant; and 3) a resulting damage to the plaintiff.").

April 25, 2025, letter promising to provide parts for ten years. Docket 1-3. But the warranty obligations, sales objectives, and termination for cause provisions, covered in §§ 7(e), 10, 18, and 21 are supported by the complaint. Docket 1-1 at 2, 3-4, 6-9. NATT alleges a breach of § 27, which prohibits amendments to the agreement unless they are in writing and signed by both parties. Docket 1 ¶ 22; Docket 1-1 at 10. In every other area of the complaint, NATT refers to the Cessation Letter as a de facto termination. *See generally* Docket 1. Here, the court construes NATT's argument as one framing the Cessation Letter as an amendment that would be an alleged breach of § 27.

NATT also claims DEI "refuse[d] to repurchase" the three chassis, after NATT so requested under § 22 of the Dealer Agreement. *Id.* ¶¶ 25, 26, 28; Docket 1-1 at 9. DEI argues the Cessation Letter was merely a proposal to all dealers who may be interested in assisting the wind-down process of DEI, not a termination letter. Docket 48 at 3. Companies may not hide behind clever wordsmithing to avoid liability on their original contracts. Manufacturers may not "in effect terminate a . . . franchise by withdrawing from the market without incurring liability to its dealers[.]" *Groseth Intern., Inc. v. Tenneco, Inc.*, 410 N.W.2d 159, 168 (S.D. 1987).

An anticipatory breach of contract or anticipatory repudiation is "committed before the time when there is a present duty of performance and results from words or conduct indicating an intention to refuse performance in the future." 23 Williston on Contracts § 63:29 (4th ed. 2026 update); *Union Pacific R.R. v. Certain Underwriter at Lloyd's London*, 771 N.W.2d 611, 621

(S.D. 2009). This can also be called a constructive breach. *Weitzel v. Sioux Valley Heart Partners*, 714 N.W.2d 884, 894 (S.D. 2006). The obligor must "unequivocally indicate that the repudiating party intends not to honor his or her obligations under the contract." *Union Pacific R.R.*, 771 N.W.2d at 622 (quoting 13 Williston on Contracts § 39:40 (4th ed. 2000)); *see also Mobley v. New York Life Ins. Co.*, 295 U.S. 632, 638 (1935) ("Repudiation by one party . . . must at least amount to an unqualified refusal . . . substantially to perform according to the terms of his obligation."). An anticipatory breach "allows the nonbreaching party to treat the repudiation as an immediate breach of contract and sue for damages." *Weitzel*, 714 N.W.2d at 894.

Accepting the allegations in the complaint as true, as the court must do on a motion to dismiss, GGG Partners, LLC, on behalf of DEI, sent letters to all dealers informing them of DEI's wind up and cessation of business. Docket 1-2. DEI chose to cease operations with its dealers due to the unsatisfactory market conditions. *Id.* at 1. On its face, the letter demonstrates DEI's intent to withdraw from the market and cease operations. *Id.* To withdraw from the marketplace means to stop selling new products to dealers. The sale of DEI products was the foundation and purpose of the Dealer Agreement. The purpose of the Dealer Agreement was to grant NATT "exclusive rights" with the obligation "to market and sell" DEI's products. Docket 1-1 at 1. According to the explicit language in the Cessation Letter, DEI's intent was to achieve "a consensual resolution[]" during its wind-up process and, if its attempt to resolve failed, DEI would "explore its other alternatives." Docket 1-2 at 2.

In *Minneapolis Cmty. Dev., Agency v. Lake Calhoun Assocs.*, 928 F.2d 299, 302-03 (8th Cir. 1991), the Eighth Circuit affirmed an order for a judgment notwithstanding the verdict on an anticipatory repudiation claim because the disputed letter only requested payment under the contract creating no inference of ceasing performance if payment was not made. Here, the Cessation Letter creates an inference of DEI's intent to wind up its operations and cease its business after noting DEI's portrayal of the market conditions as unfavorable for its continued participation. Docket 1-2 at 1. In light of the wind-up context, even if DEI did not intend to fully terminate and breach the original contract at that time, but to propose an amendment to the Dealer Agreement, the Cessation Letter can be viewed as an anticipatory breach or anticipatory repudiation.

The Cessation Letter indicated DEI's intention to withdraw from its current participation in the truck and trailer market due to a lack of stakeholder return. *Id.* By expressing this intention to its dealers, DEI articulated its plan not to continue the franchise relationship or provide new products for the remaining term in the Dealer Agreement. By discontinuing this relationship, DEI cannot realistically fulfill its warranty obligations or establish future sales objectives. And DEI did not describe in either letter that it sent to NATT any of the enumerated causes for termination listed in the Dealer Agreement. *See* Docket 1-1 at 7-9. Thus, NATT is allowed to treat the Cessation Letter as an anticipatory breach of the Dealer Agreement and sue for damages.

And it did so when it notified DEI of its intention to pursue litigation in its June 3, 2025, response to the Cessation Letter. Docket 1-4.

DEI argues that South Dakota law does not recognize constructive, or de facto termination. Docket 48 at 9. But a breach of contract claim does not require an element of termination. A constructive breach of contract allows NATT to sue for damages resulting from the alleged breaches under §§ 7(e), 10, 18, and 21. And, in the alternative, if the Cessation letter is construed to be an amendment, NATT may plead a breach of § 27.

Additionally, NATT has sufficiently pleaded damages over $1,000,000.00. Docket 1 ¶¶ 23, 28. Each of the three upfitted chassis DEI sold to NATT for resale had a retail value of around $350,000. *Id.* ¶ 13. In the Cessation Letter, DEI offered to compensate NATT $30,000 for each "Existing Vehicle." Docket 1-3 at 1. This offer is much less than the approximate market value of the three chassis. NATT further states DEI's decision to cease operations disrupted NATT's ability to sell the remaining DEI products because customers were concerned about uncertain warranties. Docket 1 ¶ 17. NATT's pleaded damages result from its receipt of the Cessation Letter informing it of DEI's withdrawal from the market and DEI's alleged refusal to repurchase the three chassis in good condition, in violation of § 22. *Id.* ¶¶ 24-26; Docket 1-1 at 9.

DEI and NATT entered into a Dealer Agreement, which NATT alleges was anticipatorily breached by DEI, resulting in damages that satisfy the amount-in-controversy requirement. *See* 28 U.S.C. § 1332(a). Thus, the breach of contract claim survives the motion to dismiss.

### C. Implied Covenant of Good Faith and Fair Dealing

"Every contract contains an implied covenant of good faith and fair dealing that prohibits either contracting party from preventing or injuring the other party's right to receive the agreed benefits of the contract." *Schipporeit v. Khan*, 775 N.W.2d 503, 505 (S.D. 2009) (citation modified); *see also* Restatement (Second) of Contracts § 205 (1981). "The implied obligation must arise from the language used [in the contract] or it must be indispensable to effectuate the intention of the parties." *Taylor Equip., Inc. v. John Deere Co.*, 98 F.3d 1028, 1031-32 (8th Cir. 1996) (alteration in original). Good faith is defined as "honesty in fact in and the observance of reasonable commercial standards of fair dealing." SDCL § 57A-1-201(20). The implied covenant is intended to fill in gaps but cannot "block use of terms that actually appear in the contract." *Taylor Equip.*, 98 F.3d at 1032 (quoting *Continental Bank, N.A. v. Everett*, 964 F.2d 701, 705 (7th Cir.), *cert. denied*, 506 U.S. 1035 (1992)).

As support of DEI's alleged breach of the implied covenant of good faith and fair dealing, NATT refers to the de facto termination implied by the Cessation Letter. Unlike in *Nygaard v. Sioux Valley Hosps. & Health Sys.*, 731 N.W.2d 184, 194 (S.D. 2007), where the South Dakota Supreme Court found the plaintiff failed to state a claim for breach of the implied covenant of good faith and fair dealing because an implied price term would directly contradict an express price term in the contract, an implied covenant requiring good faith termination here would not contradict express provisions in the Dealer Agreement.

NATT's allegations are similarly distinguishable from those in *Taylor Equipment*. In that case, the dealer agreement between Deere and Midcon was terminable by either party without cause, and included a no-assignment-without-approval provision, which preserved Deere's right to choose Midcon's successor. *Taylor Equip.*, 98 F.3d at 1033. The court determined that Midcon's implied covenant claim failed as a matter of law because Midcon had "no justified expectation that Deere was agreeing to surrender" its explicit contract right to approve an assignment and an implied covenant could not override that explicit contract provision. *Id.* Here, the Dealer Agreement could be terminated without cause by NATT but DEI could only terminate the contract with cause. Docket 1-1 at 7. There is no provision in the Dealer Agreement referencing a wind up and withdrawal procedure or the obligations of the parties if either ceased operations in the market. *See* Docket 1-1. And the provision allowing for termination without cause only references NATT; DEI has an obligation to only terminate for the causes specified in §§ 22(c) and (d). An implied obligation to operate in good faith during a wind up and withdrawal process is "indispensable to effectuate the intention of the parties." *Nygaard*, 731 N.W.2d at 194 (internal quotations omitted). Because withdrawal from the market functions as a termination of a dealership contract, DEI must operate in good faith to ensure NATT receives the expected benefits of the Dealer Agreement. This is true even if the expected benefits, due to the withdrawal, only amount to DEI's liabilities.

NATT's complaint, supplemented by its attached June 3, 2025, response letter, includes allegations of a "bad faith scheme to coerce dealers to capitulate to [DEI's] demands." Docket 1-4 at 2. The Cessation Letter alludes to "other alternatives" if dealers do not accept the "Proposal." Docket 1-2 at 2. Although DEI argues in its brief supporting its motion to dismiss that the Cessation letter did not imply "it would fail or refuse to fulfill it statutory and contractual obligations to its dealers[]", Docket 48 at 3, the language in the Cessation Letter suggests otherwise. GGG Partners LLC did not make clear whether one of the "other alternatives" included abiding by the original Dealer Agreement and incurring liabilities to dealers from early withdrawal. NATT is not alleging that DEI did not have a right to terminate the contract. Rather, NATT alleges that DEI has an obligation to wind up in good faith if it terminates the contract, not through a conditional resolution proposal threatening "other alternatives." Docket 1-2 at 2. DEI did not accuse NATT of any conduct that would justify a for-cause termination of the Dealer Agreement as allowed under § 21. *See* Docket 1-2; Docket 1-4; Docket 1-1 at 7-9. Without cause to terminate, DEI's obligations to NATT under the Dealer Agreement remain intact and can be enforced through a breach of contract claim.

Manufacturers have a duty to protect their franchisees, and a breach of that duty is actionable at law for damages. *Groseth*, 410 N.W.2d at 168 (reversing and remanding for a determination of just provocation and whether the dealer agreement was terminated without due regard for the equities of the dealer). Because South Dakota's public policy requires franchisors, who

operate with superior bargaining power, to withdraw from agreements in good faith, an implied covenant may fill in the gaps of the Dealer Agreement. *See Kmak v. American Century Cos.*, 754 F.3d 513, 519 (8th Cir. 2014) (reversing the district court's dismissal of an implied covenant claim because Missouri's public policy required the defendant not to retaliate against an employee). Thus, NATT's breach of contract claim based on a theory of an implied covenant of good faith and fair dealing is adequately supported by the allegations in the complaint to withstand a Rule 12(b)(6) motion.

## II. Count II: Violation of South Dakota Law § 32-6B-1, *et seq.*

SDCL § 32-6B-45 prohibits a franchisor from terminating a dealer agreement without "good cause." The statute further defines good cause as:

> failure by a vehicle dealer to substantially comply with essential and reasonable requirements imposed upon the vehicle dealer by the vehicle dealership agreement, if the requirements are not different from those requirements imposed on similarly situated vehicle dealers by their terms.

*Id.*

Good cause includes the non-exclusive eight enumerated circumstances in the statute. *See Eddie's Truck Ctr., Inc. v. Daimler Vans USA LLC*, 5:21-CV-05081-VLD, 2023 WL 3388503, at *3-*4 (D.S.D. 2023). NATT qualifies as a vehicle dealer, DEI qualifies as a franchisor, and the three chassis DEI sold to NATT qualify as a vehicle.[2] Therefore, the South Dakota Dealer Act applies.

---

[2] SDCL § 32-6B-1(30) defines "vehicle dealer" as "any person who, for commission or with intent to make a profit or gain, sells, exchanges, rents with option to purchase, offers or attempts to negotiate a sale or exchange of new, or new and used vehicles, or who is engaged wholly or in part in the business of selling new, or new and used vehicles." Under the Dealer Agreement, NATT

The South Dakota Dealer Act prohibits improper termination. SDCL § 32-6B-45. A manufacturer may terminate if it does so with "due regard for the equities of the dealer" and with "just provocation," which requires some misconduct or shortcoming on the part of the dealer. *Groseth*, 410 N.W.2d at 168. The South Dakota Dealer Act's purpose is to protect those with inferior bargaining power: the franchisees. *Black Hills Truck & Trailer, Inc. v. MAC Trailer Mfg., Inc.*, 13-4113-KES, 2014 WL 12768809, at *5 (D.S.D. 2014).

DEI argues NATT's claim fails because DEI did not terminate the Dealer Agreement. Docket 48 at 8. As discussed with Count I, the Cessation Letter can reasonably be treated as an anticipatory breach. The Cessation Letter's omission of the word "termination" cannot camouflage the letter's purpose to encourage dealers to agree to new terms reducing DEI's liabilities amid its wind up and withdrawal from the market.

Further, even if the Cessation Letter is found to be a proposal to amend the original agreement, DEI has not stated good cause to "substantially change the competitive circumstances of [NATT's] vehicle dealership agreement[.]" SDCL § 32-6B-45. Crediting vehicles and allowing dealers to be free of any claim by DEI relating to vehicles on order or existing vehicles is a substantial

---

operates as DEI's vehicle dealer selling truck chassis and parts. Docket 1-1 at 1. SDCL § 32-6B-1(16) defines "franchisor" as "any person engaged in the manufacturing or distribution of vehicles including any person who acts for the franchisor." As a manufacturer providing vehicles to NATT under the Dealer Agreement, DEI operates as a franchisor. Docket 1-1 at 1.The three chassis qualify as vehicles under SDCL § 32-6B-1(29), which defines vehicle as "any new or used automobile truck, truck tractor, . . . semitrailer or travel trailer[.]" The three chassis provided to NATT were "fully completed garbage trucks" and thus fall under the statute's definition of "vehicle." *See* Docket 1 ¶ 31, n.4.

modification of the original Dealer Agreement. *See* Docket 1-2. Also, NATT alleged that the Cessation Letter affected its competitive business in the market because customers were "no longer willing to purchase or even seriously consider purchasing DEI trucks." Docket 1 ¶ 17. South Dakota law provides that any violation of SDCL § 32-6B-45 gives a franchisee the right "to bring a civil action to recover damages as well as costs, disbursements, and reasonable attorney's fees." *Eddie's Truck Ctr.*, 2023 WL 3388503, at *4. Thus, if the Cessation Letter is deemed a proposal, DEI did not state good cause to substantially modify the Dealer Agreement. Either interpretation of the Cessation Letter results in an alleged violation of the South Dakota Dealer Act.

DEI argues that the Cessation Letter did not terminate the Dealer Agreement because NATT continues to act as a DEI dealer by advertising two DEI vehicles for sale on its website. Docket 48 at 8-9. DEI cites the provision in the Dealer agreement that requires NATT to "immediately remove all Company names, logos, signs, marks, and advertisements" on the termination date. Docket 1-1 at 9. But when one party breaches a contract, the nonbreaching party has a duty "to mitigate avoidable damages." *Dakota Style Foods, Inc. v. SunOpta Grains and Foods, Inc.*, 329 F. Supp. 3d 794, 810 (D.S.D. 2018). NATT's decision to list its current inventory of DEI vehicles after it received the Cessation Letter can reasonably be interpreted as an attempt to reduce the damage caused by DEI's withdrawal from the market. In fact, DEI acknowledged in the Cessation Letter that dealers "retain title to the Existing Vehicles and may sell or transfer the vehicles . . . free and clear of any interest

or claim of the Company." Docket 1-2 at 1. Regardless of NATT's website listings, NATT's complaint sufficiently alleges termination without good cause and supports an improper substantial change without good cause. Thus, NATT has stated a plausible violation of the South Dakota Dealer Act.

## III. Count III: Violation of SDCL Ch. 37-5

If a manufacturer "desires to cancel or discontinue the contract[,]" the manufacturer must "pay to the dealer, unless the dealer should desire to keep the merchandise, a sum equal to one hundred percent of the net cost of all current unused complete merchandise[.]" SDCL § 37-5-5. To "cancel" means "[t]o terminate a promise, obligation, or right[.]" *Diesel Mach.*, 777 F. Supp. 2d at 1205; *Black's Law Dictionary* (9th ed. 2009). This statute applies to the Dealer Agreement between DEI, the manufacturer, and NATT, the dealer.[3] SDCL § 37-5-3 limits § 37-5-5's application to instances of "unfair cancellation." *Taylor Equip.*, 98 F.3d at 1035.

Statutory construction is a question of law and South Dakota statutes are "to be liberally construed with a view to effect [their] objects and to promote justice." SDCL § 2-14-12; *Diesel Mach.*, 777 F. Supp. 2d at 1205. The purpose

[3] DEI is considered a manufacturer because it "engage[s] in the manufacturing or distribution" of chassis and relating parts. *See* SDCL § 37-5-13(4); Docket 1 ¶ 1. The Dealer Agreement is considered a dealership contract as defined in SDCL § 37-5-13(2). Docket 1-1. And NATT is a "dealer" because it receives chassis and related parts under the dealership contract with the obligation to offer and sell the products to the public in South Dakota, North Dakota, and Nebraska. *See* SDCL § 37-5-13(1); Docket 1-1 at 12.

of Chapter 37-5 is to protect South Dakota franchisees, like NATT. *Diesel Mach.*, 777 F. Supp. 2d at 1205.

In *Diesel Machinery*, the South Dakota District Court found that a manufacturer's notice of intent to terminate did not qualify as a cancellation under § 37-5-3. *Id.* at 1209. In this case, that interpretation remains true and applies to § 37-5-5. But, unlike in *Diesel Machinery*, the Cessation Letter functions as a notice of termination rather than a notice of intent to terminate. In *Diesel Machinery*, Manitowoc, the manufacturer, sent a notice of cancellation and subsequent letters stating that it was giving DMI, the dealer, a 90-day notice of termination rather than notice of immediate termination. *Id.* This 90-day notice was later withdrawn. *Id.* In contrast, DEI could not withdraw the Cessation Letter because the wind-up and market withdrawal process had already begun. Further, the Cessation Letter cannot be interpreted as a notice of intent to terminate in the future because DEI gave NATT no guidance as to what misconduct formed the basis for termination or what actions NATT could take to prevent termination. *See* Docket 1-2; Docket 1-4.

Also, in *Taylor Equipment*, the Eighth Circuit found that the manufacturer's letter advising the dealer of termination if the dealerships were not sold within 18 months due to the dealer's deficiencies was not constructive cancellation. *Taylor Equip.*, 98 F.3d at 1035. The Eighth Circuit based its dismissal of a wrongful cancellation claim under SDCL § 37-5-3 on the "factual inconsistenc[ies]" in the complaint. *Id.* Unlike in *Taylor Equipment*, where the alleged unfair cancellation contradicted the facts pleaded in the implied

covenant claim, DEI's alleged unfair cancellation does not contradict any other claim in the complaint. *Id.* In *Taylor Equipment*, Midcon, the dealer, acknowledged that it continued to be an active dealer in support of its claim that the manufacturer breached the implied covenant relating to the assignment clause of the contract. *Id.* In that case, the unfair termination claim directly conflicted with the implied covenant claim because Midcon claimed the breach of the implied covenant occurred after constructive termination. *Id.* Here, viewing the facts in the light most favorable to the non-moving party, NATT claims both DEI's breach of contract and breach of the implied covenant occurred contemporaneously with the constructive termination. Thus, neither claim conflicts.

As referenced previously, a manufacturer may not escape liability to its dealer when it terminates a franchise through withdrawal from the market without cause. *Groseth*, 410 N.W.2d at 168. DEI cannot escape the liabilities stated in SDCL § 37-5-5. The Dealer Agreement includes a section entitled, "NO COMPENSATION UPON TERMINATION," but the provisions allow NATT to request DEI to 1) "purchase all current Dennis Eagle Products which are in good and saleable condition at the price which is the most current dealer net," 2) "purchase all current parts which are in good and saleable condition . . . at the original purchase price subject to a maximum value of Dealer's purchases in the prior 12 months," and 3) "purchase any and all specialized machinery and tooling required for the service of any Dennis Eagle Products." Docket 1-1 at 9. The Dealer Agreement contemplates liabilities resulting from termination.

*Id.* As discussed with Count II, the Cessation Letter cites no misconduct on the part of NATT to justify cancellation without incurring liability. Docket 1-2. DEI's liabilities could include those articulated in the statute, specifically, the obligation to buy back the three chassis at a "sum equal to one hundred percent of the net cost[.]" SDCL § 37-5-5; Docket 1 at ¶ 39. Thus, NATT sufficiently pleaded an unfair cancellation of the Dealer Agreement in violation of SDCL § 37-5-3 both by pleading DEI's termination of the agreement itself and failure to perform its obligation to buy back the three chassis as a result of the cancellation.

## IV. Count IV: Fraudulent Inducement

"Because one of the main purposes of [Rule 9(b)] is to facilitate a defendant's ability to respond" to the complaint's charges of fraud, "conclusory allegations that a defendant's conduct was fraudulent and deceptive are not sufficient to satisfy the rule." *Com. Prop. Invs., Inc. v. Quality Inns Int'l, Inc.*, 61 F.3d 639, 644 (8th Cir. 1995). SDCL § 20-10-1 provides that "[o]ne who willfully deceives another, with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers." [4] Deceit is defined as

[4] In a diversity action, the case is governed by state substantive law. *See Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). Thus, the court applies South Dakota substantive law to this tort claim. The Dealer Agreement's choice-of-law provision does not apply to tort claims, including claims of fraud and misrepresentation seeking monetary damages, arising from this franchise contract. Docket 1-1 at 10; *See* 62B Am. Jur. 2d Private Franchise Contracts § 194 (2026); *Stabler v. First State Bank of Roscoe*, 865 N.W.2d 466, 476 (S.D.

> 1) [t]he suggestion, as a fact, of that which is not true, by one who does not believe it to be true; (2) [t]he assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true; (3) [t]he suppression of a fact by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact; or (4) [a] promise made without any intention of performing.

*Cohen v. Nw. Growth Corp.*, 385 F. Supp. 2d 935, 954 (D.S.D. 2005).

To plead actionable fraud, South Dakota requires the plaintiff to plead facts that demonstrate

> a representation was made as a statement of fact, which was untrue and known to be untrue by the party making it, or else recklessly made; that it was made with intent to deceive and for the purpose of inducing the other party to act upon it; and that he did rely on it and was induced thereby to act to his injury or damage.

*Stabler*, 865 N.W.2d at 477 (quoting *N. Am. Truck & Trailer, Inc. v. M.C.I. Commc'n Servs. Inc.*, 751 N.W.2d 710, 713 (2008)). "For a theory based upon fraud to succeed, it is not enough that one party intend to defraud another." *Fenske Media Corp. v. Banta Corp.*, 676 N.W.2d 390, 394 (S.D. 2004). A defendant's statements are considered mere puffery if they are "so vague and such obvious hyperbole that no reasonable [plaintiff] would rely upon [it]." *Parnes*, 122 F.3d at 547. "Optimistic statements are not actionable if they cannot be supported by objective data or otherwise subject to verification by proof." *In re Stratasys Ltd. S'holder Secs. Litig.*, 864 F.3d 879, 882 (8th Cir. 2017) (citation modified).

---

2015) ("[A] tort claim of fraud and deceit" is brought when the plaintiffs "seek[] monetary damages.").

NATT states that it "reasonably believes that DEI knew or should have known" at the outset of negotiations with NATT of the "potential imminent insolvency." Docket 1 ¶ 45. NATT alleges that DEI's representative, McCalip, made "repeated representations to NATT concerning DEI's financial strength and the stability of its parent company[.]" *Id.* ¶ 44. NATT claims McCalip's statements that "DEI would 'spare no expense' to partner with NATT" and an offer to sponsor travel to the United Kingdom were "central to NATT's decision to enter the Dealer Agreement[.]" *Id.*

Based on these facts, it is unclear whether DEI or McCalip knew of DEI's future insolvency risks when making these representations to NATT. *See id.* NATT has pleaded the identity of the person and the contents of the false misrepresentations as required by Rule 9(b). *See Bennett v. Berg*, 685 F.2d 1053, 1062 (8th Cir. 1982). But the complaint fails to allege that the statements were made before the Dealer Agreement was entered into or that DEI or McCalip had knowledge of insolvency risks or acted with recklessness as to the truth of the statements when they were made to NATT. The court finds *Broin and Assocs., Inc. v. Genencor Intern., Inc.*, 232 F.R.D. 335, 340 (D.S.D. 2005) instructive here. In that case, the court dismissed a fraud and deceit claim when the plaintiff claimed that, "[u]pon information and belief[] . . . Genencor knowingly or recklessly made [a] representation with the intent to deceive Broin and to induce it into disclosing confidential information[.]" *Broin*, 232 F.R.D. at 340. Similarly, NATT alleges its own reasonable belief as to DEI's intent to fraudulently induce NATT to sign the Dealer Agreement based on the

suspicious timing of DEI's insolvency only two years after the parties signed the Dealer Agreement. Docket 1 ¶ 45. But without more evidence of DEI or McCalip's knowledge at the time the statements were made before the Dealer Agreement was entered into, NATT's claim of fraudulent inducement fails. Thus, Count IV is dismissed without prejudice.

**CONCLUSION**

Based on the foregoing, it is

ORDERED that DEI's motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) (Docket 47) is granted in part and denied in part.

Dated October 23, 2026

BY THE COURT:

/s/ *Karen E. Schreier*
KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE